1083548, Riggs Construction v. Comm'nity. Council may proceed. Good morning, Your Honors. May it please the Court. My name is Andrew Fernandez. I'm here on behalf of Plaintiff Appellant, Riggs Construction. I want to spend a brief moment describing the background, the factual background of the case because this is a manifest weight case where we believe if you understand the factual background and you understand the medical terminology in the case, it is clear that the lower court's decision is against the manifest weight of the evidence. Now, Mr. Carmody is a journeyman carpenter. He was a journeyman carpenter for approximately 30 years. Taking you back to 2005, late January, the night of January 30th, it snowed. There was a thin layer of snow on the ground. January 31st, the day of the accident, Mr. Carmody was working on the second story of an unfinished house. He was called downstairs to the first level to fix trussing in the house. Now, he decided instead of using a ladder to descend from the second level to the first level using partition blocks, essentially wooden blocks nailed to the wall of the house. The critical error that Mr. Carmody made in choosing this approach of descent is that when he got to the first block, he chose to jump off of it and instead of hitting the ground, he hit a tarp that was covering a hole in the ground. So Mr. Carmody fell about 10 to 12 feet. When he fell, he landed on his feet and thereafter slipped backwards landing on his on his buttocks and on his hands to catch him. These are all very, very important facts. Now, I want to talk briefly about Mr. Carmody's pre-existing conditions. And forgive me if I explain a little bit about medical terminology, but again, the importance of this is that if you understand the medical terminology, it becomes much clearer that the decision is against the manifest weight. Now, Mr. Carmody has degenerative cervical arthritis. The cervical spine is the area of the spine roughly from the base of the skull to the top of the shoulders. Degenerative, of course, meaning that this condition gets worse over time. Mr. Carmody has bilateral arthritis in both of his hands. He has ulnar neuropathy, which refers to problems with a nerve that extends roughly from the wrist to the shoulder. And in addition to that, Mr. Carmody has low back pain and has experienced low back pain since approximately the 1970s when he was involved in a car accident. Now, on the date of this accident, Mr. Carmody fell on his feet, then his buttocks, and then his hands. There was no head or neck trauma. This is undisputed factual evidence. In the medical reports, it also confirms that there was no head or neck trauma. He was neurologically intact after this accident, meaning there were no problems. What's the CT scan that shows an acute compression fracture? What's up with that? What was the data of the scan that you're referencing? I don't recall, but I have it here in the notes. Do you know anything about that? Yes, if you don't mind, I'll get to that in just a moment. You do know that's the worst thing you can ever say to an appellate panel. I apologize. This is actually my first appellate argument. It's not real serious. You're going to get hurt bad if you do that. Very good. I'll address it right now then. There is a compression fracture that shows up, but this compression fracture does not relate to the cervical spine area. It relates to the low back. Where are we in this? To put this in a nutshell, are you saying the lumbar region? Correct. We're months later at this point in time when we get to that compression fracture. It's also not for several months until Mr. Carmody experiences the alleged tingling in his hands, and it wasn't for a couple days after his accident that he complained of headaches. Now, the reason that this is significant and the reason that I tried to stick with the timeline is this timeline is crucial in understanding causation here. Basically, you say lumbar injury we can live with, right? That happened. Sure. Okay.  state of ill-being. Correct. These are completely separate. And this is not a case where an accident happens and a few months later symptoms just appear and manifest themselves. That would be true in the case of, for instance, a whiplash injury. That is not the case here. Mr. Carmody fell on his on his butt and on his lower back. We don't dispute that. But then he later several months later complains of neck problems. These are unrelated injuries. His accident did not cause what was already an existing injury that just over time happened to get worse. Could the accident arguably be said to have aggravated? No, no, it couldn't. And the reason that we know that is Dr. Itkin and an independent medical examination said specifically that the fact that these symptoms did not manifest until I believe it was four or five months after the accident specifically show that it is not medically possible for the accident to have caused his condition. That's the testimony of it can isn't there contrary to medical  Not really. And I say not really. Dr. Lamont. Where does he come in? Dr. Lamont Lee is the treating physician. Now the critical distinction between Dr. Lobolia and Dr. Itkin is a couple things. First of all, Dr. Lamont Lee as a treating physician is not looking for the cause. He's just trying to help his patient woman. Did he testify forget about what he should have been looking for? Sure. Yes. Dr. Lamont Lee did testify and Dr. Lamont Lee's testimony actually in his testimony. He says he never officially rendered an opinion on what caused he did make a note in one of his reports to be clear. He did make a note in one of his reports that the fall caused a pre-existing condition to be symptomatic. However, we know that this is based on no proof. This is based on incomplete medical testimony where we have an instance of Mr. Carmody not giving Dr. Lamont Lee a full picture of his full medical history. The fact that he has all of these conditions and all of these pre-existing problems. If it didn't say it's an aggravation of a pre-existing condition. He wrote that he wrote that in his report. But again on when he was examined about that he did not consider that to be an official statement of causation. He actually said let's be real clear. He said that the January 21st fall caused the claimants underlying cervical stenosis to become symptomatic correct and necessitating surgical intervention. Correct. Yeah. Okay. And again, although he said that I urge this court to keep that in its proper context. Dr. Lamont Lee made that statement more or less as a footnote not as I am diagnosing this patient to determine the cause. It's not made in that context. Well, the Commission found that it carried the day didn't it? The Commission erroneously did find that that carried weight. Yes. Again, I think that if you read Dr. Itkin's report and you understand Dr. Itkin's report and you combine that with your own interpretation of the facts and of the medical evidence you find that clearly this decision is against the manifest way. Because you believe Itkin's more credible than Lamont Lee in essence, right? No, I do not believe one doctor to be more credible. Or better than the other. I simply think that they were the context in which they rendered opinions was entirely different. And whereas Dr. Itkin, this man, this claimant had an asymptomatic condition before his fall. Correct. He was capable of performing full duties as a carpenter. Correct. He falls through this hole in the floor. It's covered up by paper. And after that, he's got the condition. When it becomes symptomatic, even Itkin testified that it was asymptomatic before the fall. Correct. But Dr. Itkin also testified and as did the defendant, Mr. Carmody, if I'm not mistaken, that a condition such as arthritis, even though it was largely unsymptomatic beforehand, does manifest symptoms. I mean, you do have pain in your hands. Mr. Mr. Carmody testified to that, that he did have arthritis in his hands. He did have some pain in his neck prior to this accident. That's just that that is the nature of the pre-existing condition. Again, when when Dr. Itkin examined Mr. Carmody, there were no spinal cord problems. He had no symptoms of cervical stenosis when he was in the hospital after his fall. And that led Dr. Itkin to the conclusion, oh, in addition to the fact that he performed an EMG study, which scientifically proved that this could not be related to his accident. For these reasons, we think that that portion is against the manifest weight. Now, I also briefly want to address penalties and fees for which we believe were erroneously awarded against the manifest weight. As this Court is aware, the standard is vexatious and unreasonable conduct, and the reasonableness comes from we have to put ourselves in the position of the employer at the time. Here, there was a good-faith dispute as to accident, and although we're not disputing accident here, again, this was an experienced carpenter who we believe defied not only safety, but conventional common sense and good judgment in jumping off of a makeshift ladder onto a snow-covered floor, which could have had holes in it. That just defies common sense. So we thought... What do you mean it could have had holes in it? It's a... Is it a common thing for floors to have holes in them, covered up by Tyvek paper? In a construction site, absolutely. You think so? Yes. What construction site? Do you have an expert that said that? I do not have an expert that said that. Nobody testified this happens on every construction site. This was a hole in the floor, covered up by Tyvek paper. The man said he couldn't even tell there was a hole in the floor, and so he jumps off and he climbs up the side, which they testify they do all the time, even though they're not supposed to, and he falls through a floor and falls how many feet? About 10 to 12 feet. 10 to 12 feet and lands down there. Do you think you should have construction sites during snowing time covering huge holes in the floor with white Tyvek paper? Is that a bright thing to do? There were markings on the paper and the hole was also surrounded by two-by-fours. Again, this particular dispute is not over accident and how outrageous was the conduct. My point is simply that our company had a good faith reason to believe that the defendant's behavior was so outside reasonable safety standards. Why was that specifically? Pardon me? Why was that specifically? Descending, jumping down a few feet onto the floor, whether you're coming down wall studs or ladders, how is that outside the normal course of defense for a construction worker? Construction workers, and this was a particularly experienced construction worker, aren't supposed to do that. They know that's a safety violation. Had he used a ladder, the ladder would have had to stand on some solid ground to get down there. He couldn't have possibly fallen in this hole. Isn't there a long line of cases that specifically said that where an employee is injured while violating a work rule, it's still entitled to compensation as long as he does not act outside the scope of his employment? Yes, Your Honor, and that is why we are not disputing accident. We're just trying to assert that we had reasonable grounds on which to dispute that and the reason that penalties are inappropriate. In addition to that, we had and we still maintain a good faith dispute as to causal connection, as I just articulated earlier. And additionally, the credibility of the claimant was at issue. He lied in his medical reports. He lied on the stand in deposition testimony. So again, you're focusing on cervical, right? Correct. What about the lumbar injury? I believe we paid for that. Okay. So, I mean, in other words, you provided compensation for that injury. He fell on his rear end. You're saying it's good faith belief that was the only injury was to the lower lumbar region. Correct. And you disputed the cervical on the basis of the tenuineness of the relationship between the two. Absolutely correct. And that you were not vexatiously engaged in delay. Correct. In compensating for what you thought the facts reasonably would suggest. Correct. Compensable injuries. Correct. And for those reasons, we respectfully request that this Honorable Court reverse the commission and the circuit court decision on the issues of causation and penalties and fees. Thank you, counsel. You may respond. Good morning, may it please the court. Counsel. This court as well as the Supreme Court is outlined in giving guidance to practitioners both as respondents and petitioners with regard to the commission's role in the Workers' Compensation Act. Counsel, before you get too far, could you tell us who you are? Sure. Kevin Bugler from Martin Healy's office on behalf of the petitioner Lawrence Carmody. Thank you. I'm sorry. The commission's role, this court just outlined it in the Hostiny case, is to assess the credibility of witnesses, resolve conflicts and evidence, including conflicting medical testimony as well as assign the weight. This respondent asked this court to ignore that construction and to submit its own, its own, to assign its own credibility to the witnesses, the conflict and the evidence and to basically set aside the commission's decision. That's not appropriate. This was a 3-0 decision in which the commission indicated that the review of the evidence indicated that it wasn't simply a close case, that no other decision was appropriate. This was an incident where the petitioner fell 10 to 12 feet through a hole. He lanted on his back. He was taken from the scene and placed in a cervical collar. He was evaluated by an emergency room physician who then brought in Dr. Lamole at the, while he was still in the hospital. There was noted to be cervical tenderness. He was, an MRI was prescribed. That MRI showed a herniated disc in the cervical spine. He was also, remained in the hospital for four days receiving treatment on both his back as well as the cervical spine. He complained of pain to the cervical spine. He complained of headache during that stay. He was discharged with a cervical collar, a hard cervical collar as well as a hard back brace and was diagnosed with a cervical cord contusion. And the respondent wants you to say ignore all that and follow Dr. Itkin's testimony when Dr. Itkin said that there was no evidence of any neck injury until six months later. And that testimony was rejected just based on the very facts of the case and the medical records that were submitted. So I ask, there's ample evidence in this case to support the commission's finding. Now, this court has also given practitioners guidance with regard to compensable injuries and the respondent's responsibility and role in determining when a case is compensable and what the defenses to a compensable case are. In this case, the respondent never paid any compensation. They didn't pay any TTD. They didn't pay the emergency room bill. They didn't pay the hospital bill. They didn't pay the ambulance bill. Counsel is incorrect in that statement. Counsel is not the one who tried the case, but I can submit that to this court. There was never any payment done and the basis for it was the violation of the safety rule. Now, this court has also instructed the parties prior decisions in the Ander case that penalties are a question of fact for the commission to decide. Respondent wants you now to set aside that principle and find the penalties weren't warranted. The case I think that is illustrative is the Saunders case. The Supreme Court instructed the workers' comp practitioners that an employee is deemed to be in the course of his employment is he injured in a place where the worker may be reasonably in the performance of a duty and while fulfilling those duties. Any good faith basis that the respondent may have had in this case would evaporate when they discussed the facts and circumstances of this case with their foreman Jack Faisal. He testified in this case, but he certainly was available to the respondent prior to that and he testified that the petitioner was instructed to go to the first floor and he was in the process of going into the first floor when he was injured. He was doing what he was instructed to do and he was in the course of his employment while he did. Was he instructed to use the blocks between the wall studs instead of a ladder? No, there were no instructions for him. He was simply instructed to go to the first floor and move a truss. Is it disputed that he violated a work rule when he did that? Is it disputed that he violated a work rule? Is that in dispute on your side of the case? I don't believe it. It is in dispute. The issue really goes to did he violate a work rule and was that the cause of his injury? The arbitrator found that it wasn't. The arbitrator found that it wasn't an unsafe act and furthermore that even if it was an unsafe act, that wasn't the reason for his injury. The reason for his injury was falling through the paper-covered hole that was covered. I understand, but does he have a right to make a good faith argument on that? He does have a right to make a good faith argument except for the line of cases for the last 30 years that says that a violation of a safety rule is not a good faith defense if the petitioner is in the course of his employment and doing his job when he violates that safety rule. The other thing I think that's interesting is the fact that no matter whether or not he climbed down the wall or whether he used the ladder, none of those actions would have been a safe action. The testimony in the record in this case is that the employer didn't provide ladders that were OSHA approved and safe. The testimony was that the only safe ladder would be a ladder that extended three feet above the deck. None of those ladders were available. And so no matter what ladder the petitioner used in this case, all of them would have violated the safety rule. And so to now come and say, well, he violated the safety rule, that was our good faith basis. We know that that's not an appropriate defense if he's doing this job. We also know that that's a question for the commission and that there's ample support for their institution of penalties in this case. Now, the area that I'd like to address that I would ask this court to provide guidance in is the area with regard to the average weekly wage. In this case, we know that Section 10, as well as the Sylvester case, tells us that you look at the 52-week period, however, if the petitioner misses five days, then you use the weeks and parts thereof method. That is a question, generally going to be a question of fact for the commission. In this case, however, and the Faisal case tells us, or excuse me, the Ferris case tells us, when there is no disputed issues, it's a question of law. Here, it's simply a matter of math. There was no, there's no objection and the respondent doesn't contend that there is anything, any dispute with regard to the wages that were earned. We know that all of the wage stubs were submitted for the 52-week period and we know that that shows there were more than five days missed. Well, it does. No, it only shows how many hours he worked each week. You never introduced evidence as to how many days he missed. You introduced evidence in some weeks, eight hours, some weeks 40 hours, some weeks 32 hours. You can work five days and only work eight hours. Whose burden is it to prove how many days were missed in order to establish the five? The testimony in this case was that the petitioner worked an eight hour workday. And we have the testimony with regard to the hours. He didn't always work an eight hour. He was supposed to work an eight hour workday. That was supposed to be his workday. You want us to assume that if he worked less than 40 hours, he missed a day that week or worked less than 32 hours. It would have been an easy question to ask him, how many days you worked that week? And nobody bothered to ask him. Well, Your Honor, the testimony that is in the record is that he worked from 730 to 330, which was an eight hour day. There were breaks included in there. And that he worked from Monday through Friday. That is the testimony in the case. And so we have a 40 hour workweek based on a five hour workday. We don't have any testimony. He didn't always work even multiples of eight. And he testified that the only time he didn't work a complete 40 hour workweek were on days when either it was inclement weather or there were material shortages or the shop was closed. No, he indicated, that's not what he said. What he said was, he normally worked a 40 hour workweek. However, he didn't work when there was inclement weather, when there was a holiday or when the shop was closed. That's what he testified to. He never testified that he always worked eight hours a day. That was his normal workday. But he never said he worked it every day. It just doesn't need to be heard. And that's the trouble with commissioning him. They said this record is just such a mess. We can't do anything with this. And so they divided it by 52. And so I suppose my question to you is, is it a failure of proof? No, it's not a failure of proof because what my burden is and what I'm required to do is establish what his regular workweek is. What his... No, if you want us to use the other method and want us to divide it, then you've got to tell us how many days he missed so that we can perform the division. We can't perform this division. Neither could they. Not based on what you've given us. Well, if we review the wage jobs that were submitted in evidence, that there weren't disputed at all, he worked 39, I believe it's 39, 39.99 weeks. I don't have it sitting in front of me, but I know that it's simply a matter of math to determine what the hours were for the various weeks. There was no including, there was no inclusion of overtime in that. There was no inclusion of bonuses in that. That was simply the straight 40-hour workweek and looking at the hours that he did work. The earnings of the remainder of the weeks after you subtract the weeks in which he worked less, lost, when he lost 500 days or more, whether or not in the same week, then the earnings for the remainder of the 52 weeks are to be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted. Well, how many weeks are parts thereof? We don't know how many days he lost. The weeks and parts thereof are listed and I apologize. I don't have it in front of me. I know it is part of the brief and I believe it's 38.99. I didn't say 38.99 because what you did was you took the hours, you took 40 hours a week and said a 40-hour week is a full workweek. You took the number of hours that he worked in 52 weeks. You divided that by 40 and came up with 39.99. That's not the formula under the Act. The testimony in this case was that the days that he missed, those out of those 40 hours were a result of things not under his control, that he missed more than five days. He didn't say that. He never said that. That's the problem. He never said he missed more than five work days. And by the way, they're calendar days. Lost five or more calendar days. I mean, we know that he worked less than 40 hours in a week, but we don't know that in those weeks he lost a calendar day of work. If a guy works four hours in a day, has he lost a calendar day? No. If he works two hours in a day, has he lost a calendar day? No. He hasn't lost it if he's worked one hour a day. He's got to say five days I didn't work. That's all he's got to say and he didn't say it. I mean, it's a problematic thing. The commission had problems with this. Well, I think you should specifically say we had difficulty with this because of the condition of the record. That was the arbitrator that or the arbitrator. They didn't change it. No, I agree with that. But then the question that becomes what is the sufficient proof to establish that he's worked less than a 40-hour workweek? No, it's not less than a 40-hour workweek. He's missed five calendar days. Don't get to the 40-hour workweek. Not what the statute says. Stay out of the hours. Stay out of the hours. Stay into the days. I mean, that's the problem we have with it. The other thing, too, I should comment. You cited six commission cases in your brief. You're not supposed to cite commission cases. Those, they have no precedential value. I understand that and I pointed that on my brief. I recognize. Well, because I think they're a luster of the arguments that were made by the respondent with regard to we had a good faith basis. Well, we know that there are commission cases out there. Forget about the commission cases. We've got cases. Absolutely, but to come before this court and say, well, we had a good faith basis when the commission has routinely rejected those arguments. I think that's appropriate. I did say and I know and I pointed out I recognize that they don't have precedential value, but I also think that given the given the issues in the case with regard to whether or not they have a good faith basis. I think they are. They do have some appropriate value and that's why I said they have no value. None whatsoever. You know, we have cases and that's what the rules require is to argue our case. Okay, time is up. Thank you, counsel. Thank you. Counsel, you may reply. You don't dispute that when he fell through this hole, he's working. Oh, no, absolutely. He was working. Okay. And my reply is only very brief. We are not. You addressed, I think counsel pointed out, and he was kind to say you didn't try this case, but that apparently you were completely wrong on this compensation issue. You told us, it was my understanding, that you went tightly providing compensation for the lumbar injury. It was, that was my understanding as well. You never made the argument in your brief that you didn't pay compensation to this claimant because you were relying on your expert's opinion. You never made that argument. Your only argument in this brief is you didn't pay compensation because he violated the work rule. And that's the only argument you made before admission. That's correct. But we did also argue in the brief that an additional reason besides the violation of the work rule was a claimant's was in dispute and continues to be in dispute. You never found out the claimant's credibility until you got him into the hearing. You didn't know what he was going to say. That is correct. So how could you rely on that when you didn't pay him any compensation? That came after you didn't pay him any compensation. So did Eiken's opinion. You never paid him any compensation before he had Eiken's opinion. And the only thing that you argue in this brief is we didn't have to pay him any compensation because he violated the work rule. And the commission turned around and said, well, the work rule is working. It's not a good faith basis and they sanctioned him for it. It is a good faith basis, though, if the method in which he violated the rule was so egregious that it took him outside the scope of his employment. It's so egregious about a carpenter coming down, coming down the fire stops. He wasn't just coming down a fire escape. He was coming down fire stops. I'm sorry, a fire stops. He was coming down a makeshift wall, blocks that were haphazardly nailed to the wall. And again, we have testimony that this is not a safe practice that the defendant himself was aware that this is an unsafe practice that they get yelled at if they are caught doing this. Let me ask you this. Your opposing counsel claims there's evidence in the record that even if he had a ladder, there were no safe ladders, according to OSHA standards, at the work site. That is, that is, that is completely untrue and that is contradicted in the record. Defendant's co-worker descended a ladder in order to get to the petitioner to help him. The paper that was over the hole, it was already broken after the petitioner went through it. Correct. The co-worker didn't have to worry about standing on a piece of white ivy with snow on it, not even knowing it was there. That is correct. Nonetheless, he did use a ladder to safely descend from the second floor to the first and then down to the basement. There was a ladder in the work site. Was there any testimony about whether or not the ladder was a safe ladder according to OSHA? That I do not know. Ladders there may not have met OSHA standards, correct? That is possible. Your honors, we are not asking this court to ignore any evidence. Rather, we are encouraging this court to look closer at the medical evidence because it is our distinct understanding that if this court interprets the medical evidence in the record, the only possible conclusion is that the lower court's decisions were against the manifest way. Thank you. Thank you, counsel, for your arguments in this matter this morning. It will be taken under advisement.